J-S01034-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.B.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.E.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1168 WDA 2025 |

Appeal from the Order Entered August 20, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 024 of 2025

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.T.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.E.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1169 WDA 2025 |

Appeal from the Order Entered August 20, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 025 of 2025

BEFORE: BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: March 19, 2026**

D.E.P. ("Father") appeals from the August 20, 2025, orders that involuntarily terminated his parental rights to his biological sons, then-five-year-old N.B.P. and twenty-one-month-old D.T.P. (collectively, "Children").[1]

---

[*] Former Justice specially assigned to the Superior Court.

[1] Presently, N.B.P. is over six years old and D.T.P. is nearly two and one-half years old.

Upon review, we observe that the record lacks a required 23 Pa.C.S.A. § 2511(b) inquiry by the orphans' court into whether an emotional bond exists between each child and Father and, if one does, whether severing it would serve each child's best interests. Accordingly, we remand to the orphans' court, which, after it receives the certified record, shall have 30 days to file a with this panel an opinion incorporating a Subsection 2511(b) best interests analysis comprising its assessments of both the child-biological parent bonds and child-foster parent bonds. Panel jurisdiction is retained.

The Orphans' Court has authored an opinion for each of the two adoption cases consolidated in the present matter. Other than transposing the names of the children, the opinions are identical in content and provide as follows:

> This matter was before the Court on a Petition for Involuntary Termination of Parental Rights under 23 Pa.C.S.A. § 2511, filed by the Petitioner, Westmoreland County Children's Bureau (hereinafter "WCCB" or "agency") on March 5, 2025. The WCCB sought to involuntarily terminate the parental rights of [D.E.P.], biological father (hereinafter "Father"), and [P.G.], biological mother (hereinafter "Mother") of [D.T.P] [and N.B.P.]. A Termination of Parental Rights Hearing took place on July 22, 2025. Neither parent attended the Termination of Parental Rights Hearing. After careful consideration of the evidence presented, the Petitions will be granted based on the following findings of fact and applicable law.
>
> . . . .
>
> The WCCB became involved with the family in July of 2023 when the agency received a referral voicing concerns over the illegal substance use by Mother and Father. On July 5, 2023, Mother was discovered passed out in a vehicle at a gas station with the windows rolled up and [N.B.P.] in the vehicle. The vehicle ran out of gas and the air conditioning was not running in the vehicle. The temperature at the time was eighty-five degrees.

Mother was charged with Driving Under the Influence, Endangering the Welfare of Children, and other traffic related offenses.

Following this incident, the assessment caseworker went to the parties' home and no one answered the door. A child was believed to be in the home. The police were notified. The caseworker returned to the home on July 19, 2023, and [N.B.P.] appeared in the window, but no one came to the door. The police were called a second time to assist, and [N.B.P] went to wake-up his parents.

On September 18, 2023, additional referrals were made to the agency raising concerns over inadequate supervision of [N.B.P]. [N.B.P] was alleged to have been crying outside of the home at midnight. During the same month another referral was made after [N.B.P] was observed to be standing on a pool ladder unsupervised and [he] was later discovered unattended in the neighbor's yard. On another occasion [] N.B.P was observed running alongside the street without an adult present or shoes. [The] oldest sibling had to step in to ensure N.B.P.'s safety and to move him away from the street.

Concerns remained regarding the parent's use of illegal substances, and random drug screens were put into place by the Westmoreland County Children's Bureau.

On November 15, 2023, [D.T.P.] tested positive for illegal substances at birth. The drug screen Mother was given after release from the hospital, was positive for illegal substances. Mother was released from the hospital on November 17, 2023, but [D.T.P.] remained in the NICU. [D.T.P.] displayed symptoms of withdrawal, including weight loss, tremors, diarrhea, and body stiffness. [D.T.P.] suffered from medical conditions on account of Mother's use of illegal substances while [D.T.P.] was in utero. Neither Mother nor Father visited the infant child while he remained in the hospital six days after his birth. Mother did not receive prenatal care.

Father also tested positive on two of the five successful drug screens. Father tested positive for methamphetamine and on the second screen. Father was positive for THC. Father refused to comply with screens after that point.

The agency filed a dependency petition for [D.T.P.] and [N.B.P.] due to the parents' continued use of illegal substances and failure to comply with the recommended services. Concerns remained for the parties' abilities to adequately supervise the children.

In the Order of Adjudication and Disposition, Mother was ordered to participate in random drug screens; undergo an updated drug and alcohol evaluation all recommendations from said evaluation until successful discharge; undergo a mental health evaluation and follow all recommendations until successful discharge; participate in parenting instruction; and to allow the agency access to her home, specifically the basement, to assess the home for safety and appropriateness.

Father was ordered to undergo an updated drug and alcohol evaluation and to follow recommendations from the evaluation until successful discharge, comply with random drug screens requested by the agency or any other agencies, participate in parenting instruction; and to allow the agency to access his home in its entirety.

A Permanency Review Hearing was held on June 5, 2024. Both Mother and Father attended the hearing.

Mother had minimal compliance with the permanency plan in that she was going to Medmark for her prescribed dosage of methadone but Mother was not participating in all drug and alcohol services recommended through the provider. Mother never provided any documentation to the caseworker that she successfully completed drug and alcohol services. Mother did not participate in any of the random drug screens attempted during that review period. Mother completed the Parents in Recovery curriculum and was set to participate in additional parenting instruction. Mother participated in 18 of the 27 offered visits with [Children]. Mother did not participate in a psychological evaluation or any mental health services that the caseworker is aware of. Mother had not made any progress during that review period. Mother was missing visits with [Children] and not complying with her drug and alcohol treatment. Mother refused to participate in random drug screens and never allowed the agency to assess her residence. Mother completed the "Parents in Recovery" program.

- 4 -

J-S01034-26

Mother was ordered to participate in an updated drug and alcohol evaluation and follow the recommendations until successful discharge; participate in random drug screens; undergo a mental health evaluation and follow all mental health recommendations until successful discharge; participate in parenting instruction until successful completion; and allow the agency to access her entire house.

Father had minimal compliance in that he maintained his employment. Father did not obtain a drug and alcohol evaluation and did not comply with random drug screens. Father completed the Parents in Recovery program and was set to continue with parenting instruction. Father did not allow the agency to assess his home and missed visits with [Children]. The Court determined that Father had not made any progress since Father failed to comply with random drug screens and failed to participate in drug and alcohol services. Father missed eight visits with [Children] and did not allow the agency to assess his residence.

Father was ordered to comply with random drug screens; participate in a drug and alcohol evaluation and follow treatment recommendations until successful discharge; to undergo a mental health evaluation and follow all recommendations from the evaluation until successful discharge; to participate in parenting instruction until successful completion; and to allow for the agency to assess his residence in its entirety.

A second Permanency Review Hearing was held on December 18, 2024. Neither parent attended the second review hearing. Mother's compliance was deemed minimal. Mother did not participate in any of the attempted random drug screens. Mother participated in the parenting instruction programs. Mother attended less than half of the visits offered with [Children] and Mother had minimal contact with the caseworker. Mother did not undergo either the mental health evaluation or the drug and alcohol evaluation. Mother made no progress as Mother had not participated in any random drug screens and was not consistent with visiting [Children].

Mother was ordered to undergo an updated drug and alcohol evaluation and follow the recommendations until successful discharge; participate in random drug screens, undergo a mental health evaluation and comply with all recommendations until successful discharge, be prompt for visits with [Children] and

- 5 -

scheduled appointments; and to allow the Westmoreland County Children's Bureau to assess her residence.

Father's compliance was minimal. He completed various parenting programs. Father missed 20 offered visits with [Children]. Father did not comply with any of the random drug screens and failed to participate in a psychological evaluation. The caseworker was unable to reach Father. Father made no progress during that review period as he was not compliant with any random drug screens. Father engaged appropriately with [Children] during visitation.

Father was ordered to participate in an updated drug and alcohol evaluation and follow recommendations until successful discharge; participate in random drug screens; undergo a mental health evaluation and follow recommendations until successful discharge, be prompt for visits, transportation for services, and scheduled appointments; and to allow for the agency to assess Father's residence.

The third Permanency Review Hearing was held on June 4, 2025. Mother and Father participated by telephone. The Court determined that Mother had no compliance during the review period. Mother did not participate in random drug screens and was not attending visits with [Children]. Mother had minimal contact with the agency and did not participate in any of the other court ordered services. Mother remained unemployed and her housing situation was unknown. Mother made no progress on account of her lack of participation with any of the services ordered.

Mother was ordered to participate in random drug screens; undergo a drug and alcohol evaluation and follow all recommendations until successful discharge; undergo a mental health evaluation and comply with the recommendations until successful discharge; and to arrive promptly for visits, in addition to scheduling/confirming all appointments.

The Court determined that Father had not made any progress and had not complied with the agency during that review period. Father only attended two visits with [Children] and did not participate in any of the attempted random drug screens. Father remained employed but his housing situation was unclear. Father refused to allow the agency to assess his home.

- 6 -

Father was ordered to comply with random drug screens requested by WCCB or another provider; undergo a mental health evaluation and follow recommendations until his successful discharge; and to arrive promptly for visits, in addition to scheduling/confirming all appointments.

At the conclusion of the termination proceeding, Kelly M. Eshelman, Esq., Guardian *ad Litem* agreed with the Westmoreland County Children's Bureau that terminating the parental rights of Mother and Father would best serve the needs and welfare of [Children].

Orphans' Court Opinion, filed 9/22/25, at 1-8 (unpaginated) (footnote omitted)

On September 19, 2025, Father timely filed the present appeal. He raises the following questions for this Court's consideration.

1. Did the trial court abuse its discretion and/or err as a matter of law by finding, pursuant to 23 Pa.C.S.A. § 2511(b), that a termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the minor children[?]

2. Pursuant to 23 Pa.C.S.A. § 2511(b), did the trial court abuse its discretion and/or err as a matter of law by not evaluating in its trial court opinion the bond between the parents and minor children, and whether a necessary and beneficial parental bond exists[?]

3. Pursuant to 23 Pa.C.S.A. § 2511(b), did the trial court abuse its discretion and/or err as a matter of law by not evaluating in its trial court opinion whether severing the parental bond would cause the minor children extreme emotional consequences[?]

Brief for D.P. (Biological Father), at 4.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the

decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights through a statutory scheme requiring orphans' courts to apply a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established, by clear and convincing evidence, grounds for termination under one of these subsections, it must then assess the petition pursuant to

Section 2511(b), which requires an orphans' court to "give primary consideration to the developmental, physical, and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). A child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023).

"Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child. *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993)." *In re Adoption of A.G.R.*, (non-precedential decision) (Pa. Super. filed November 5, 2025) at *8. )[2]; *see also Interest of K.T.*, 296 A.3d at 1105-06 ("[I]f the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task."). *See also Interest of R.F.*, 345 A.3d 283, 289 (Pa. Super. 2025) (vacating termination decree and remanding where orphans' court failed to address both the testimonial evidence indicating that a parent-child bond may exist between the mother and R.F. and the effect that termination would have on him). Furthermore, "orphans' courts 'must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.'" *Interest of K.T.*, 296 A.3d at 1106.

---

[2] *See* Pa.R.A.P. 126(b) (providing that unpublished nonprecedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

Father argues that the orphans' court erred and abused its discretion when it terminated his parental rights without complying with its obligations under Section 2511(b) and interpretive caselaw to analyze the bond between Children and him. We are constrained to agree. We address only this issue, as it is dispositive of the appeal.

Neither the record nor the orphans' court's order and opinion reflects that it undertook a Section 2511(b) analysis of the parent-child bond as a component of the larger assessment of each child's emotional needs and welfare. It is unclear if the orphans' court found the record devoid of any evidence of a parent-child bond in both cases—despite evidence to the contrary—and concluded it could implicitly infer the lack of a bond, or if it viewed the parents' failure to show for a bonding assessment appointment grounds to find that no bond existed, or if it inadvertently omitted an analysis from its order and opinion.

Regardless of what may have caused the lack of an orphan's court's Section 2511(b) bond analysis, our review of the record leads us to conclude that one is necessary. The evidentiary hearing on the petition for involuntary termination included expert opinion testimony that N.B.P. has a bond with his parents—particularly Mother—such that termination could have an effect on him. The question arises, therefore, whether the bond is necessary and beneficial to him.

Specifically, the orphans' court heard the testimony of Dr. Christine Mahady, who specializes in trauma and attachment assessments, which, she

opined, are "deeper than a bonding assessment." N.T. at 81. Dr. Mahady testified to the conclusions she made after considering "the nature of the attachment between [N.B.P.] and his biological parents." N.T. at 81.

Dr. Mahady first assessed N.B.P. in January of 2024, less than one month after he was brought into care. Altogether, she attended three to four biological parent visits per month, at the Children's Bureau, from January to April of 2024. N.T. at 81-82. She testified that during these visits "N.B.P. seemed particularly attached to his mother, [Mother], so he wanted to be with her. He wanted to sit on her lap. . . . She has a very kind demeanor towards N.B.P., very patient." N.T. at 82.

As for Father, Dr. Mahady reported he "oftentimes would be taking care of the infant [child D.B.P.] in the room and [was] less engaged with N.B.P., but not to that end that he wasn't caregiving him and playing with him and giving him food. [It was just that] [t]here were . . . two children in the room. N.T. at 82.

Overall, she agreed that both biological parents were appropriate during the two-hour visits, with no safety issues arising. N.T. at 102. They consistently met N.B.P.'s needs by holding him, hugging him, playing with him, making eye contact with him, taking him to the restroom, making sure he was fed and had water, and changing his clothes if they had to. N.T. at 102-103, 105. They were engaged during the entire visit. N.T. at 103.

When counsel for Father addressed Dr. Mahady's entry in her report noting that parents are capable of providing consistent, loving, engaging experiences with N.B.P., Dr. Mahady answered, "Yes. When they're with him, yes. When they show up." N.T. at 104.

Dr. Mahady also testified that N.B.P. called his parents "mommy and daddy," and he initiated affection to them, as well: "He initiated it, yes. He hugged them when they left. He didn't cry when they left, though." N.T. at 105, 106.

When asked what she saw "of the nature of the attachment between N.B.P. and his [biological parents]," Dr. Mahady answered, "N.B.P., he was connected with [Mother] and he was connected with [Father]. What N.B.P. disclosed to me, this process of disclosure that we call it, is that he did witness violence between [Father and Mother]. He seemed a bit more fearful of [Father]." N.T. at 82-83.

Despite identifying a connection between N.B.P. and his parents, Dr. Mahady decided in April of 2024 to discontinue attachment work between them because biological parents were cancelling visits and refusing to submit to drug tests. N.T. at 83. Dr. Mahady explained her decision:

> N.B.P. needs consistency. He needed a sense of permanency. My worry, with increasing that attachment, was that it's not fair to the child if you do attachment work and increase the attachment and the parent is unable to be consistent. That is a standard of care for attachment work. . . . The parent would have to be sober and be committal to visits. [Otherwise,] [i]t's just not fair to the child. That is a standard of care in our line of work.

- 12 -

N.T. at 83.

Eventually, Dr. Mahady resumed observing visits between Mother and N.B.P., once in June and once in July of 2024, with both visits occurring in a new venue, the Monessen Family Center. N.T. at 84. She testified that during the visits, Mother took care of N.B.P. She brought him food and she played with him. N.T. at 84. During this same time frame, Dr. Mahady noted, N.B.P. was also thriving in his first foster home and doing very well there, as he was emotionally available and open to taking direction from his caregivers. N.T. at 84.

When asked what differences there were between the way N.B.P. interacted with foster parents and the way he interacted with his biological parents, Dr. Mahady answered that N.B.P.'s current foster parents provided a more structured environment, where N.B.P. has become a structured child who accepts guidance and directions,[3] whereas in biological parents' visits with him, he was less structured, which manifested in his tendency to gorge himself on food, for example. Dr. Mahady's opinion was that such unstructured behaviors derived from N.B.P.'s "feral" existence when living with drug addicted parents who neglected him. N.T. at 85. She emphasized,

_____

[3] Dr. Mahady testified that present foster parents redirect N.B.P. appropriately, whereas biological parents exhibited poor direction skills during supervised visits, as N.B.P. frequently refused to take direction from them to the point where, for example, a supervisor had to interject and say to N.B.P., "please clean this up." N.T. at 91.

however, that N.B.P. "did miss his mother significantly after visits." N.T. at 87.

Dr. Mahady expanded on the topic of N.B.P.'s well-being while living under the care of his current foster parents, who wish to adopt him. She noted that N.B.P. now is happy and doing very well in school, and he is enjoying his new foster home environment. N.T. at 87. "He is – he loves his new foster parents," Dr. Mahady testified. She continued, "When I spoke with him last week, he said he wants to live there forever, but he hopes he can still see his mom. . . ." N.T. at 88.

Dr. Mahady "anticipate[d] with this termination that [N.B.P.'s] going to experience some loss if rights are terminated. We think that's going to be difficult for him." N.T. at 87. New foster parents, however, are willing to permit post-adoption contact between N.B.P. and his biological parents and siblings and already have allowed a visit with N.B.P.'s older half-brother (Mother's child), who lives with their maternal grandmother. N.T. at 88. Foster parents said they would never prevent N.B.P. from seeing his biological parents if it was safe for him to do so,[4] and, for now, they would feel comfortable if the visits with biological parents were supervised. N.T. 88, 89.

Dr. Mahady also addressed how Mother's drug dependency lifestyle has prevented her from meeting N.B.P.'s needs. "When she shows up – when [Mother] is on, she's a very loving parent. My concern is lifestyle with her. .

---

[4] With the apparent implication being that if parents were actively using, it would not be safe.

. . It's not her ability to parent. . . . [W]hen we talk about what a child needs minute to minute, hour to hour, day by day, the parent has to be engaged fully." N.T. at 90. It seemed like because of biological parents' drug lifestyle, N.B.P. was raising himself, Dr. Mahady opined. N.T. at 90. For N.B.P., developmental gaps occurred in social foundations like empathy and kindness. N.B.P. was trying to survive, Dr. Mahady testified, so it was hard for him to learn those things. N.T. at 90.

Dr. Mahady recommended that if the court terminates Mother's and Father's parental rights, therapeutic work for N.B.P. commence to help him cope with separation grief, "because he's going to miss Mom particularly." N.T. 93. She hoped an adoptive family would allow N.B.P. to maintain contact with Mother, but she emphasized that N.B.P. needs permanency. He has been in care for over a year. He needs parents who will put him first and give him meaningful experiences and academic experiences. N.T. at 93. To that end, she observed that current foster parents were loving and most supportive, providing N.B.P. with all the basics necessities and extras, such as art classes, vacations, and pets. N.T. at 93.

Asked whether it would be in N.B.P.'s best interest, ultimately, to return to biological parents, Dr. Mahady answered:

> I can't speak to that. What I can speak to is that this has to be N.B.P.'s last stop in foster care because he left a foster home where he was connected and now he's in another foster home. These are how kids development [sic] attachment disorders. He is connecting there. It's a good sign. He wants parents. He wants to feel that love.

If [biological mother] can meet – if [biological mother] and [biological father] can be there for him second to second, minute to minute, hour to hour, day by day and meet his needs consistently – it's my understanding they're not coming to supervised visits at this point for a couple hours a week. I know that because when N.B.P. saw me, he said, Ms. Christine, why are you cancelling my visits? I said, ["B]uddy, it's not me cancelling your visits.["] So they're not even, to my understanding, being consistent with visits, let alone what this foster family is giving him, that minute to minute, hour to hour, day by day, and meeting his needs in all the ways.

N.T. 94-95.

Asked how Father and Mother could meet N.B.P.'s needs in this way, Dr. Mahady answered, to a reasonable degree of certainty within her profession, "Sobriety. Sobriety and, likely, a lot of their own therapeutic healing, that they're able to identify the barriers within themselves that took them away from their child and took them away from being present." N.T. at 95.

She opined, further, that N.B.P. still had a sense of love for and a connection with Mother and, for that matter, a bond with her, although the doctor stated to Mother's counsel that "a bond is – you and I can have a bond." N.T. at 97. Instead, she emphasized that it is a child's "attachment" to a parent that occurs during the first three to five years of life, when the parent's pattern of caregiving and meeting child's needs produces positive effects on the child's maturing brain, that enable child to develop a secure attachment to the parent. N.T. at 98. She expounded,

**Dr. Mahady:** "When there's a sense of neglect, which is what this appeared to be and appeared to look like [with biological parents], that all has to be repaired. . . . It's not just about the parent being able to display the set of behaviors. It's also how

the child then metabolizes those behaviors. Do I think N.B.P. would metabolize the behaviors if his [biological] mother were to come back in and we were to nurture that? Yeah, I do. Has she – can she be consistent with it? To this point, no, she has not been consistent with it.

It will do further damage if we start to nurture this attachment and then she pulls away. Right now, he has people who are repairing with him and are giving him every opportunity and are meeting him emotionally and spiritually and physically. It's just not fair to continue attachment work when this lifestyle seems to be in the way of the parents consistently doing what they have to do.

N.T. at 98-99.

Decisional law on Subsection 2511(b) requires an orphans' court to conduct a bonding assessment where there is evidence indicating that a parent-child bond may exist and the child may experience loss from the termination. *Interest of R.F.*, 345 A.3d at 289 (orphans' court abused its discretion in failing to consider the nature and extent of R.F.'s bond with Mother in evaluating his best interests under Section 2511(b)). Here, because Dr. Mahady identified between N.B.P. and his parents a loving "connection," "bond," and/or an "attachment," albeit an insecure attachment, we are constrained to conclude that it was incumbent upon the orphans' court, which presided over the termination hearing and heard all witnesses, to conduct the requisite needs and welfare analysis under Section 2511(b), with particular reference to both the child-biological parent bond and the child-foster parent

bond, before reaching the decision of whether to terminate parents' parental rights.[5, 6]

Therefore, we remand this matter to the orphans' court, which, after it receives the certified record, shall have 30 days to file with this panel an opinion incorporating a Subsection 2511(b) best interest analysis comprising its assessments of both the child-biological parent bonds and child foster-parent bonds.

Case remanded for proceedings consistent with this decision. Prothonotary shall remit the certified record immediately. Panel jurisdiction retained.

_____

[5] The record reveals the orphans' court twice scheduled a formal bonding/attachment assessment between biological parents and Children, and on both dates, April 14, 2025, and April 22, 2025, parents failed to show. Nevertheless, as discussed, the record contains other evidence relevant to the issue of whether a parental bond or attachment exists between Children and parents that would inform the Section 2511(b) analysis.

[6] Similarly, with respect to D.T.P., the orphans' court shall review the record and conduct a Section 2511(b) analysis.